**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CR-00049 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FERNANDO ZAMBRANO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Fernando Zambrano was a Palos Heights police officer from 2011 to 2020. Most of the time, however, he was assigned to a federal Homeland Security Investigations task force. In 2018, federal law enforcement agents began investigating one of Zambrano's Task Force partners and one of their confidential sources (whom the parties refer to as Source A) on the disappearance of $50,000 in drug-buy money. As part of the investigation, in April 2019, federal agents interviewed Zambrano for around four hours. During the interview, Zambrano made some statements about his interactions with Source A concerning the investigation into the buy money's disappearance. Zambrano now faces a charge of knowingly making false statements to federal agents, 18 U.S.C. § 1001(a)(2). R. 1, Indictment.[1] Zambrano has moved to dismiss the indictment for failure to state an offense, or in the alternative, to suppress the statements from his interview, arguing that they were obtained in violation of his rights. R. 44, Mot.

---

[1]Citations to the record are noted as "R." followed by the docket entry.

to Dismiss/Suppress. For the following reasons, the Court denies the motion in its entirety.

## I. Background

In 2013, Fernando Zambrano was assigned, from his position as an officer with the Palos Heights Police Department, to serve on a Department of Homeland Security's Homeland Security Investigations (HSI) task force. Mot. to Dismiss/Suppress at 2; R. 48, Gov't. Resp. at 2.[2] The federal task force provided Zambrano with office space and issued him an HSI computer, mobile phone, and email account. Gov't. Resp. at 2. By 2018, Zambrano had been working for several years with HSI Special Agent Anthony Sabaini as his partner. *Id.* Specifically, they "worked on a narcotics and money laundering squad that participated in numerous narcotics and money seizures in the Chicago area and other states." *Id.* Together they handled several confidential sources for HSI, including two individuals referred to by the parties as Source A and Source B. *Id.* In 2018, the Federal Bureau of Investigation, along with the Department of Homeland Security Office of the Inspector General, started investigating Sabaini. *Id.* The investigation stemmed from the disappearance of $50,000 in drug-buy money that Zambrano and Sabaini had supposedly given to Source A to buy drugs during a controlled buy in January 2017. *Id.* at 2–3. The government alleges that, in February 2019, federal agents contacted Source A in an attempt to interview him; Source A in turn told Zambrano about the contact. *Id.* at 3. Zambrano allegedly told

---

[2]Certain facts asserted in the government's response brief are not contested by Zambrano, so the Court relies on them.

Source A to talk to the FBI, and after Source A participated in an interview with the FBI, Zambrano allegedly asked Source A about the interview and about "the scope and nature of the FBI investigation." *Id.*

In March 2019, Special Agent Tony Chesla, of the Department of Homeland Security's Office of the Inspector General, contacted Zambrano to schedule an interview as part of the buy-money investigation. Gov't. Resp. at 3. They scheduled the interview for April 4, 2019, at 10:30 a.m., at the OIG's office in downtown Chicago. *Id.* at 4. The parties agree that Chesla told Zambrano he was being interviewed as a "witness." Mot. Dismiss/Suppress at 2; Gov't Resp. at 3. They also agree that Zambrano asked if he could be interviewed at his police department in Palos Heights, but that Chesla told him the interview would take place at a federal facility (though it changed from the FBI's suburban office to the OIG's downtown office). Mot. Dismiss/Suppress at 2; Gov't Resp. at 3. Zambrano characterizes this as being "ordered to report to the office of the DHS-OIG." Mot. Dismiss/Suppress at 2.

Zambrano arrived at the OIG's office as planned on April 4. Gov't. Resp. at 4. The office was on the 10th floor of an office building in downtown Chicago and had a small, public reception area where Chesla met Zambrano. *Id.* The government says that Chesla asked Zambrano to lock his gun in a lockbox in an adjacent interview room, which he did, and that this request is made of "some but not all visitors to OIG"; Zambrano asserts that his gun was "confiscated." Gov't. Resp. at 4; Mot. to Dismiss/Suppress at 2. Chesla and Zambrano then left the public reception area and passed through a locked door to OIG's office space. Gov't. Resp. at 4. They entered

3

OIG's main conference room, which is about 40 by 40 feet in dimension, had a large street-facing window, and could seat more than 20 people at five tables. *Id.* There they met FBI Special Agent Zach Weller, who, unbeknownst to Zambrano, was audio-recording the interview. *Id.* Both Weller and Chesla wore business attire and were not visibly armed. *Id.* at 5.

After greetings and brief chit-chat, Chesla gave Zambrano a waiver form to review; the form was entitled, "Federal Employee Warning Form." Gov't. Resp. at 5. In presenting the form, Chesla offered, "Ask me any questions if you have it." Gov't. Resp. at 5; R. 49, Gov't. Exh. A, Transcript at 2.[3] The form stated: "This is a voluntary

---

[3]The Court takes this opportunity to decide Zambrano's motion to file under seal the exhibits to his motion, R. 42, and the government's implied motion to file the interview transcript under seal, R. 48, Gov't. Br. at 6. The Seventh Circuit has emphasized the principle "that litigation be conducted in public to the maximum extent consistent with respecting trade secrets, the identities of undercover agents, and other facts that should be held in confidence." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by Americold Realty Trust v. Conagra Foods, Inc.*, 577 U.S. 378 (2016); *cf. Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002). Several of the Defendant's exhibits do meet this burden, at least in part: R. 45-1, Def's. Exh. A, Interview Audio; R. 45-6, Def's. Exh. F, FBI Record of April 4 Interview; and R. 45-6, Def's. Exh. G, FBI Record of Aug. 1 Interview. The substantial parts of these exhibits that discuss confidential informants; Zambrano or Sabaini's work undercover; or similarly sensitive law-enforcement information from the HSI task force, should be kept under seal. The same applies to the transcript of the April 4 interview filed by the government at R. 49. This Opinion cites only to non-sensitive parts of these exhibits, or in effect redacts sensitive information (for example, referring to "Source A" instead of using the source's name).

Normally, when parties seek to file exhibits under seal, they are required to simultaneously file a redacted version on the public record. *See* Local Rule 26.2. But because redaction could be quite laborious for these exhibits, they need not be filed immediately. Having said that, counsel will have to deal with this before trial, at least for those exhibits that are introduced into evidence, because by then the public will have a right of access to at least a redacted public version of each exhibit entered into evidence.

Zambrano's motion to seal is provisionally denied as to the following: R. 45-2, Def's. Exh. B, Sign-Out Sheet; R. 45-4, Exh. D, OIG Memo Re: HSI Cell Phone Records; R. 45-5, Exh. E, OIG Memo Re: Five HSI Payments; and R. 45-6–R. 45-18, Exh.'s. H–S (mostly printouts of OIG rules). None of these exhibits appear to contain the kind of sensitive

interview. Accordingly, you do not have to answer questions. *No disciplinary action will be taken against you solely for refusing to answer questions.* Any statement you furnish may be used as evidence in any future criminal proceeding or agency disciplinary proceeding, or both." Gov't. Resp. at 5 (emphasis added). For a few minutes, Zambrano reviewed the form and chatted with Weller and Chesla, and then Chesla asked Zambrano if he understood his rights; Zambrano said he did, and then signed and dated the form. Gov't Resp. at 5; Transcript at 2–4. Throughout their interview, including these first few minutes, all three men spoke in calm, friendly tones. *See generally*, R. 45-1, Def's. Exh. A, Audio Recording of Interrogation (from now on, the recording will be cited as "Audio") at 2:20–8:30[4]; Transcript at 1–5. After Zambrano accidentally wrote the wrong date on the form, the agents asked him to correct it. Transcript at 5. Zambrano explained his error with the date by mentioning that he had been on leave, at which point Chesla asked how many children he had, and whether his new baby was sleeping through the night. *Id.* Zambrano answered, "No, she's a nocturnal baby," prompting Weller to laugh, and they chatted a little longer about babies' sleeping habits (or lack thereof). *Id.* at 5–6; Audio at 8:20–9:05.

After the opening chit-chat and form signing, the interview began in earnest. The interview was mostly about topics involving Zambrano's partner, Sabaini, and

---

information that must be hidden from the public. But if either side believes otherwise, then they may raise the issue when preparing redacted versions for trial (for those exhibits that will be entered into evidence).

[4]The pinpoint cites to the audio-recording of the interview refer to the elapsed time in the audio file submitted to the Court. *See* R. 70. When practicable, the Court will also include a citation to the corresponding portion of the written transcript.

their confidential source, Source B. Gov't. Resp. at 6. The conversation lasted around four hours, but the participants took various breaks, the nature and importance of which the government and Zambrano dispute. First, around one hour into the interview, Chesla said he was going to get some water, and asked if either of the others wanted anything, to which Zambrano replied, "No, I'm good." Transcript at 45; Audio at 1:06:55–1:07:00. Weller then said he would go use the restroom, and the agents discussed taking turns leaving the room so that Zambrano would not be left alone. Transcript at 45. Zambrano interjected that he could go with Weller, since he (Zambrano) also needed the restroom. *Id.* Weller offered to take Zambrano to the restroom, saying to him, "I don't remember, unless you've been here before," to which Zambrano said "no." *Id.* Because Weller was wearing the audio recorder, the recording captured this conversation, as well as Weller and Zambrano walking out of the conference room and to the restroom, which Weller opened by audibly keying in a code on a keypad.[5] Audio at 1:07:00–1:10:10. As they made their way back from the restroom, Weller and Zambrano chatted about being busy at work, and a case Zambrano was working together with OIG agents. Audio at 1:10:10–1:12:50; Transcript at 46–47. Back in the conference room, Weller again asked Zambrano if he needed anything, and Zambrano again said no. Audio at 1:12:10–1:12:20. The interview then continued.

---

[5]Although the transcript says "BATHROOM STOP" for part of this interlude, Transcript at 46, the audio recording regrettably continued for the duration of the time spent in the restroom. On the positive side, the recording leaves no room for doubt that Weller genuinely needed to use the restroom when he accompanied Zambrano there. Audio at 1:08:00–1:10:00.

6

Around two hours into the interview, Zambrano's cell phone became a topic of conversation. Transcript at 76–78. Chesla asked if Zambrano would consent to a search of Zambrano's government-issued phone for communications between him and Sources A and B. *Id.* at 78. Zambrano expressed some hesitancy because he had "a lot of personal stuff on there," including content related to his children. *Id.* at 79. Chesla explained that the agents would not need to take photos and could perform a limited extraction, but Zambrano said that he did not want to give consent. *Id.* Chesla then explained that because the phone was government-issued, it could be searched without his consent, and that the agents would tell their "phone guy," who would extract the necessary data while Zambrano completed his interview, not to take the personal content. *Id.* They discussed the phone a little more, and throughout this conversation, the agents and Zambrano still sounded calm and friendly. Audio at 2:06:00–2:10:00. Eventually Zambrano told the agents that he was going to contact "my legal counsel" about the phone issue. Transcript at 81. Zambrano and the agents talked a little more about the cell phone and the government's "limited personal use" policy, and Chesla reassured Zambrano that he would not be penalized for personal use of the phone. Transcript at 81–83. Zambrano again asked if he could contact legal counsel to "ask his advice on this," and Chesla clarified, "On whether you could give consent or not?" *Id.* at 83. Zambrano answered in the affirmative, and Chesla explained that "of course" he could talk to his attorney, if he wanted to find out if he should sign the consent form, but it would not make much practical difference since the phone would be searched either way. *Id.* After explaining general investigation

7

procedures, Chesla said, "If you want to call your legal counsel … I'm never gonna tell you not to call your attorney." *Id.* To this, Zambrano replied quickly, "Oh, I know that. Yeah for sure." *Id.* Then the agents left Zambrano in the conference room to call his attorney, and of course that call was not audio recorded. *Id.* at 84. This entire conversation concerning the search of the phone sounded, again, calm and professional, bordering on friendly. Audio at 2:10:00–2:14:50.

The exchange that led to the indictment in this case took place about three hours and 20 minutes into the interview. Transcript at 125–26. As summarized and redacted by the government, Zambrano made statements to the following effect:

> ZAMBRANO stated he received a call from [Source A] recently because [Source A] was visited by the FBI and [Source A] asked ZAMBRANO what FBI wanted. ZAMBRANO told [Source A] he did not know what the FBI wanted and advised [Source A] that [Source A] could reach out to the FBI he wanted to. ZAMBRANO stated that [Source A] never told him if he ended up talking with the FBI. ZAMBRANO stated he followed up with [Source B] after this call from [Source A] but [Source A] had not yet reached out to the FBI. Additionally, ZAMBRANO was not sure if [Source A] ever reached out to the FBI.

Gov't. Resp. at 7, citing R. 45-6, Exh. F, FBI Record of April 4 Interview (under seal).

Around 20 minutes later, which was around three hours and 40 minutes into the interview, Chesla mentioned that he needed a break. Transcript at 136; Audio at 3:38:40. Weller and Chesla asked Zambrano how he was doing and if he wanted a restroom break or something to drink. Transcript at 136. Zambrano initially said no, then asked for water, saying he had left his water in his truck. *Id.* Zambrano added that he needed the restroom again. *Id.* Weller asked if Zambrano had parked nearby. *Id.* Zambrano said he had, but that he had only fed the meter for an hour and a half,

joking, "If I get a ticket, I'm gonna come back to you guys." Transcript at 136; Audio at 3:39:10–3:39:15. Weller asked if he needed to move the car, but Zambrano answered that he could take the train to CPD if necessary and that he had "put a placard on the window." Transcript at 136, Audio at 3:39:15–3:39:30. Weller and Zambrano took a bathroom break. Audio at 3:39:30–3:41:20. Then they returned to the conference room, where Chesla gave Zambrano the water he had asked for. Transcript at 137; Audio at 3:42:21–3:42:35. The tone of the conversation remained calm and pleasant throughout this break. Audio at 3:38:40–3:43:00.

A few minutes after they all came back from their break, Zambrano suggested for the first time that he wanted to leave. Specifically, as the agents worked on his phone, Zambrano said, "It's getting kind of late I have to get home to my kids." Transcript at 138. Weller and Chesla both said "okay." *Id.* At this point it was around 2:20 p.m. *Id.* The agents handed Zambrano's government-issued cell phone back to him, and for the next few minutes, Zambrano and the agents worked together on logging into it. *Id.* at 138–40. After a few more minutes of questions, which Zambrano answered without complaint, the agents began wrapping up the interview. *Id.* at 140–47. After Chesla mentioned he had one more question, and said it had been "too many hours," Zambrano said, "I know. You guys had me in here forever, yeah?" Transcript at 147; Audio at 4:06:40–4:06:55. Weller laughed at this. *Id.* Again, the tone of the conversation remained friendly as Chesla mentioned needing to speak to Zambrano again, and Weller asked Zambrano about his plans for the rest of the day. Audio at 4:07:00–4:08:00. Zambrano asked the agents if there was "some allegation about me

9

or something like that." Transcript at 148. Weller answered, "Yeah, so, yeah, I mean, it's just based on an allegation that we have to, yeah, just kind of go through and vet it out." *Id.*

Chesla and Weller asked Zambrano a few more questions about Sources A and B as they waited for their colleague to return Zambrano's government-issued cell phone (the third agent had apparently kept working on the phone after Zambrano logged into it). Transcript at 148–52. When Chesla went to check on the phone, Weller asked about Zambrano's new baby, and Zambrano said, "Oh man, just, hard to get him to sleep at night." *Id.* at 152. They talked a little more about the baby, and Zambrano mentioned that his wife stayed home with the children, but did not speak much English, which meant that he was the one who helped his older child with homework. *Id.* Then Chesla reentered the conversation, saying "that's it for now." *Id.* The three chatted for a few more minutes about other interviews they had done and other cases they had worked on, and Zambrano shared a story about his cousin's son being the victim of accidental gang violence. *Id.* at 153–55. Then the agents thanked Zambrano for coming in, and Zambrano mentioned that he would talk to his legal counsel. *Id.* at 156. At 2:46 p.m., around four hours and 15 minutes after starting the interview, Weller ended the interview for the benefit of the audio recorder. *Id.* Again, throughout this winding down of the interview, all three participants maintained a calm, professional, even friendly tone, sometimes laughing at each other's comments. Audio at 4:08:00–4:20:00.

10

A few months later, Zambrano met again with federal agents, and this time also a prosecutor from the U.S. Attorney's Office in Chicago. Gov't. Resp. at 7. Zambrano had his attorney with him. *Id.* Zambrano clarified some of his statements from the April interview, and reviewed the report the FBI had prepared of the interview. *Id.* Zambrano did not dispute the summary of the parts of the report relevant to Source A. *Id.* In early 2020, the grand jury indicted Zambrano on the charge of making materially false statements to federal agents during his April 4, 2019 interview. *Id.* at 8; Indictment.

## II. Standards of Review

### A. Motion to Dismiss

To challenge the sufficiency of an indictment, a defendant may file a pretrial motion (so long as the motion can be decided without a trial on the merits). Fed. R. Crim. P. 12(b)(3). An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged …." Fed. R. Crim. P. 7(c)(1). To be legally sufficient, an indictment must accomplish three things: "First, it must adequately state all the elements of the crime charged; second, it must inform the defendant of the nature of the charges so that he may prepare a defense; and finally, [it] must allow the defendant to plead the judgment as a bar to any future prosecution for the same offense." *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). An indictment should align with the words of the statute, assuming that the statute specifies the elements that constitute the offense. *Id.* The indictment must "provide the defendant with some means of pinning down the specific conduct

11

at issue" but need not include every relevant fact. *Id.* (cleaned up).[6] Courts "review indictments on a practical basis and in their entirety, rather than in a hypertechnical manner." *Id.* (cleaned up).

## B. Motions to Suppress

A motion to suppress evidence must also be raised at the pretrial stage if it can be determined without a trial on the merits. Fed. R. Crim. P. 12(b)(3). "It is a well established rule that the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (cleaned up). But "once the defendant establishes a basis for his motion to suppress," "the burden shifts to the government to prove by a preponderance of the evidence that the statement at issue was given voluntarily." *Id.*

## C. Interrogations

Under *Miranda v. Arizona*, persons who are subjected to a custodial interrogation must be informed, at the outset and "in clear and unequivocal terms," of their right to remain silent, the right to consult with an attorney, and the right to have counsel present during questioning. 384 U.S. 436, 467–73 (1966). To be considered "in custody" for *Miranda* purposes, a person must be subjected to "formal arrest or a restraint on his or her freedom of movement of the degree associated with a formal

---

[6]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

arrest." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). To determine whether an individual is in custody, courts consider whether, under all of the circumstances, "a reasonable person would have felt she was at liberty to terminate the interrogation and leave." *JDB v. North Carolina*, 564 U.S. 261, 270 (2011) (cleaned up).

The Fifth Amendment further guarantees that only voluntary statements may be used against defendants, which means that involuntary statements obtained even in a noncustodial setting must be excluded. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). "A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998). Whether law enforcement behaved coercively must be examined "from the perspective of a reasonable person in the position of the suspect." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001). Factors that should be considered in deciding whether a suspect has been coerced include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights …, physical punishment; … and fatigue …." *Id.* Law enforcement officers enjoy additional protections under *Garrity v. State of New Jersey,* 385 U.S. 493 (1967). When a law enforcement officer is required to submit to questioning on pain of losing his job or being subject to employment discipline, his statements are considered coerced, and

13

he may not be prosecuted based on those statements. *Garrity*, 385 U.S. at 497–98, 500.

## III. Analysis

### A. Motion to Dismiss

Zambrano argues, first, that the indictment against him should be dismissed because it fails to state an offense. Mot. to Dismiss/Suppress at 5; Fed. R. Crim. P. 12(b)(3)(B)(v). He asserts that the allegations are "vague," and that the charged statements contain words with different possible meanings. Mot. to Dismiss/Suppress at 5. The indictment as filed, he says, does not give him the "full notice of the facts that comprise the charges" to which he is entitled. *Id.* He argues that because his allegedly false statements are vague and subject to multiple interpretations, they cannot form the basis of a sufficient indictment. *Id.* at 5–6.

This argument is unconvincing in the extreme. The indictment is more than legally sufficient to put Zambrano on notice of the charges against him. First, the indictment states each element of the charged crime under 18 U.S.C. § 1001, namely that the defendant "(1) [made] a statement that (2) was false, (3) was material, (4) was made knowingly and willfully, and (5) was made in a matter within the jurisdiction of any department or agency of the United States." *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir. 1983) (cleaned up). The indictment alleges each of these elements, Indictment at 4, identifies the specific allegedly false statements, *id.*, and alleges the facts that contradict Zambrano's statements, *id.* at 1–3. In doing so, the indictment also fully informs Zambrano of the nature of the charge against him so

14

that he can prepare a defense, as even evidenced by his motion of dismiss, which mostly consists of defenses more properly raised at trial. Finally, the indictment is specific and clear enough that by pleading to it, Zambrano would be able to bar future prosecution. The indictment thus meets all of the requirements. *Anderson*, 280 F.3d at 1124.[7]

Next, Zambrano argues that the indictment must be dismissed because the government cannot establish the elements under the statute beyond a reasonable doubt. Mot. to Dismiss/Suppress at 7. Specifically, he makes fact-based arguments about the materiality of the statement. *Id.* at 8–10. He also argues that the statements quoted in the indictment are not actually false. *Id.* at 5. These arguments are not appropriate for a pretrial motion, because they clearly go to *trial* questions that only a jury can decide in the first instance. Fed. R. Crim. P. 12(b)(3). Zambrano's motion to dismiss the indictment is denied.

## B. Interview Statements

As an alternative to dismissal, Zambrano raises several arguments for why the statements he made in the April 4, 2019 interview with federal agents should be suppressed. He argues that the statements were obtained in violation of his Fifth Amendment rights as protected under *Miranda* and *Garrity*, that the statements were

---

[7]Zambrano does not dispute that this is the standard for a sufficient indictment—the cases that he cites say essentially the same standard—but rather seems to think that because he disputes the exact meaning of the allegedly false statements, the indictment is insufficiently clear. Mot. to Dismiss/Suppress at 5–6. This is incorrect.

15

coerced, and that he was entrapped into making the statements. Mot. to Dismiss/Suppress at 10–21. None of these arguments is a winner.

### 1. *Miranda*

An individual is entitled to receive *Miranda* warnings only when he is subject to *custodial* interrogation. *United States v. Abdulla,* 294 F.3d 830, 834 (7th Cir. 2002). For purposes of this motion, the government concedes that Zambrano was subject to an interrogation. Gov't. Br. at 12–13, n. 3. The remaining question is whether Zambrano was in *custody* during this interrogation. To be considered "in custody," he must have faced restriction of movement comparable to that of somebody under formal arrest, such that a reasonable person in his situation would not have felt free to leave the interview. *Ambrose*, 668 F.3d at 954–55. The record evidence simply does not support that type of finding.

The transcript and audio recording of Zambrano's interview, and the surrounding undisputed circumstances, provide ample facts, on their own, to show that he was not in custody. As the interview began, Zambrano and the agents exchanged calm, friendly greetings. Transcript at 1; Audio at 2:20–3:20.. Zambrano was not under arrest and was never told he was under arrest. Chesla thanked him for coming in, which points to the voluntariness of the arrangement of the interview. Transcript at 1; Audio at 2:45–2:50. *Id.*[8] The tone remained calm, courteous, and even friendly and joking

---

[8]The defense and the government each present their own version of how the interview was set up, in their briefs, and neither presents evidence to support their assertions. Mot. to Dismiss/Suppress at 2; Gov't. Resp. at 3–4. Given all the other evidence of the nature of the interrogation, it does not matter whose version is correct. Even viewed in the light most

16

at times throughout the interview. *See, e.g.,* Transcript at 5–6, 46–47, 136; Audio at 8:20–9:05, 1:10:10–1:12:50, 3:38:40–3:39:30. At times, Zambrano chatted with the agents about their respective jobs, and projects they were working on. Transcript at 46–47, 147; Audio at 1:10:10–1:12;50, 4:07:00–4:08:00. Based on all these interactions, as well as the tones of everyone's voices, the encounter comes across as collegial. Plus, the agents were solicitous of his comfort, asking several times if he needed anything to drink or a break. Transcript at 45–47, 136; Audio at 1:06:55–107:00, 3:38:40–3:39:00.

Zambrano tries to identify moments of supposed restricted movement, but the record does not support his characterization of events. For example, he makes much of having been accompanied to the restroom. Mot. to Dismiss/Suppress at 3. But the transcript and audio recording reveal that Weller initiated the restroom break (that is, it is not as if Zambrano asked to go and Weller insisted on accompanying him), and went together with Zambrano, who would likely not have known where the restroom was, anyway. Transcript at 45, Audio at 1:07:00–1:10:10. The two men continued a friendly conversation on their way to and from the restroom. Transcript at

---

favorable to Zambrano, that is, he "was ordered to appear for the interrogation," Mot. to Dismiss/Suppress at 12, all the evidence surrounding the interrogation itself supports a finding that he was free to leave at any time.

Zambrano also argues that "would have been subject to discipline up to and including termination, had he not appeared." Mot. to Dismiss/Suppress at 12. This is primarily a *Garrity* argument and will be addressed in more detail in the next section of this Opinion. In short: the record does not support Zambrano's contention that he would have been disciplined for refusing to answer the agents' questions after signing a waiver that told him the interview was voluntary. The record thus also does not support the notion that he was "in custody" because he felt so heavily pressured to answer questions.

17

46–47. There is no suggestion that Zambrano was being escorted because he was somehow in custody. Moreover, to the extent that he was being accompanied as part of the protocol for visitors to a federal facility, building-security provisions like that do not transform a noncustodial setting into a custodial one. *Ambrose*, 668 F.3d at 957. The Seventh Circuit has been clear that security-based restrictions like confiscating a gun or cell phone, or escorting somebody between rooms, do not create a custodial setting. *Ambrose*, 668 F.3d at 957; *see also United States v. Budd*, 549 F.3d 1140, 1146 (7th Cir. 2008) (holding that the interviewee was not in custody despite being escorted to "a secure bathroom where the occupant could not open the door or flush the toilet from the inside").

Zambrano also emphasizes that the agents took "his" cell phone without his consent during the interview. Mot. to Dismiss/Suppress at 3. But as the agents explained, it was a government-issued cell phone that they had every right to take and search as part of the investigation. Transcript at 79. No reasonable person in Zambrano's shoes would think that taking the phone away meant that *Zambrano* could not simply leave the phone with the agents and walk out. And when Zambrano asked to speak to his legal counsel about consent to search the phone, the agents left him alone in the conference room so he could make that phone call. Transcript at 83–84. This, too, supports a finding that he was not in custody. *Ambrose*, 668 F.3d at 959 (pointing to the defendant's "free access to several individuals" with whom he wished to speak, without law enforcement present, as supportive of a non-custody finding).

18

In his brief, Zambrano also contends that he asked to go feed the parking meter and the agents told him to "find someone else to put the money in the meter." Mot. to Dismiss/Suppress at 4. But the transcript and recording reveal the exact opposite. During a break in the questioning, Zambrano mentioned that he had left his water in his truck, and Weller asked whether he had parked nearby. Transcript at 136; Audio at 3:39:10–3:39:15. Zambrano answered that he had parked nearby but his parking meter had long expired, and joked, "If I get a ticket, I'm gonna come back to you guys." *Id.* Weller asked if he needed to go move his car—and Zambrano declined. *Id.* Nothing in this exchange can be characterized as Weller refusing to let Zambrano move his car or telling him to ask somebody else to feed the meter. Indeed, Weller *literally* asked Zambrano if he wanted to *leave* the building and get into a *car*—that is almost 180º from putting Zambrano in custody. *Id.* ("Do you need go put it some-where else, or move it?").

It is also demonstrably false that Zambrano "begged to be released," as he asserts in both of his briefs. Mot. to Dismiss/Suppress at 12; R. 51, Def's. Reply at 6. First, the defense briefs do not cite to any portion of the transcript or audio to support that proposition. At the most, near the end of the interview, Zambrano stated—calmly—that it was getting late, and he needed to go home to his children. Transcript at 138; Audio 3:50:17–3:50:25. The agents responded with understanding ("okay" and "yeah") and wrapped up the interview within less than half an hour. Transcript at 138, 152. Nothing reflects "begging" to be released. At the interview's end, Zambrano did say, as they were wrapping up, "you guys had me in here forever." Transcript at

19

147. But here again his tone was mild; the comment elicited a laugh, and he kept chatting with the agents for another 10+ minutes after the comment. Audio at 4:06:40–4:20:00. Indeed, after the agents finished their questions, Zambrano continued a friendly conversation with them, asking about a case and telling a story about a family member's recent experience with gun violence. Transcript at 152–56. Not only did he not ask again to leave, but the transcript shows that he actually was not rushing to leave.

Several more facts asserted by the government, and not contested by Zambrano in his reply brief or elsewhere, further support the conclusion that Zambrano was not in custody. Even though these facts are not necessary to arrive at the non-custody finding, it is worth spelling them out here. First, though Zambrano emphasizes that he was kept in a "locked facility," the government explains that there was a locked door separating the OIG's public reception area from the private office space, where the interview took place in a conference room. Mot. to Dismiss/Suppress at 12; Gov't. Resp. at 4. Nowhere does Zambrano dispute these clarifications. As for that conference room—the OIG's main conference room—its door remained open, it was spacious (40' by 40') and it had a large window. Gov't. Resp. at 4, 6.[9] So this was not some close-quarters, cramped interrogation-style room. This setting strongly points toward a noncustodial interview, because "the room itself did not physically prevent

---

[9]The transcript of the interview confirms that Zambrano was not interviewed in an OIG "interview" room because the agents offered him the use of the interview room for his phone call with his attorney. Transcript at 84. It is true, however, that the transcript does not otherwise speak to the nature of the room where the interview did take place.

[Zambrano's] exit, nor did it suggest that he was under arrest." *Ambrose*, 668 F.3d at 957. As for Zambrano's gun, the government explains that at the agents' request, Zambrano put it in a lockbox in an interview room before proceeding to the conference room—another building policy that does not create a custodial environment. Gov't. Resp. at 4.

It also matters that Weller and Chesla were, for the most part, the only agents in the room with Zambrano, barring an interruption or two from a more technology-oriented agent who was working on the cell phone. *See generally*, Transcript and Audio. They were unarmed and in business attire. Gov't. Resp. at 5. The Seventh Circuit has explained that when just two agents are conducting an interview, they are dressed in business attire, and "the tenor of the conversation … [is] businesslike," it supports a finding that the interview is noncustodial. *Ambrose*, 668 F.3d at 957–58.

In sum, Zambrano's movement was not restricted in any way comparable to a person under arrest, and no reasonable person in his shoes would have felt that he could not leave the interview. Zambrano has not pointed to any aggression by the agents or otherwise intimidating tone that could have come across as coercive during the interview. The portions of the transcript and audio to which the parties have cited uniformly reflect a calm, professional, even cordial and collegial manner of interaction between Zambrano and the agents.

Finally, it is worth noting that Zambrano has not submitted an affidavit attesting that he felt his movement was restricted or that he did not feel free to leave. He has submitted no evidence about the interview to supplement the transcript and

21

audio recording this Opinion has cited. Some of the factual assertions in his briefs are flatly contradicted by the record evidence, as discussed above. And the numerous OIG departmental rules he submitted as exhibits are not particularly illuminating on the custody issue. Zambrano's *Miranda* rights were not violated, because they were never triggered: he was never in custody.

## 2. *Garrity*

It is time to move on to Zambrano's next challenge against the interview statements. If a law enforcement officer is compelled to participate in an interview or interrogation by the possibility of losing his job if he refuses, then he cannot be prosecuted based on the statements that he makes in that interview. *Garrity*, 385 U.S. at 497–98, 500. Some courts—though not yet addressed by the Seventh Circuit—have held that for *Garrity* to apply, a defendant must show both that he subjectively believed he would lose his job if he did not provide a statement, and that this belief was objectively reasonable. *See United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988); *United States v. Vangates*, 287 F.3d 1315, 1321–22 (11th Cir. 2002). The requirement that an officer must subjectively believe that the officer's job is on the line makes sense: *Garrity* itself involved an explicit threat of job loss. 385 U.S. at 494 (explaining that each officer was warned "if he refused to answer he would be subject to removal from office"). Also, *Garrity* reasoned that the talk-or-be-fired directive was coercive because it "is the antithesis of free choice to speak out or to remain silent." *Id.* at 497. But if the officer does not subjectively believe that the employer is imposing that coercive directive, then how can the reasoning of *Garrity* apply? It does not.

22

In his brief, Zambrano argues that he had to answer the agents' questions or lose his job, and thus all the statements that he made during that interview are protected. Mot. to Dismiss/Suppress at 15–16. But he has not offered any evidence, such as an affidavit, that he *subjectively* believed he had to provide a statement or lose his job, which would already have doomed his claim in the D.C. Circuit and the Eleventh. Mot. to Dismiss/Suppress at 14. In any event (moving on to the objective element), the record does not show that Zambrano in fact faced termination if he did not participate in the interview, or that such a belief would have been reasonable.

The biggest problem with Zambrano's argument is that before he answered any questions, he signed a form acknowledging that the interview was voluntary, that he did not have to answer any questions, and that he would not be disciplined for refusing to answer questions. Gov't. Resp. at 5. The waiver form explained, "No disciplinary action will be taken against you solely for refusing to answer questions." *Id.* (copy of signed form). *Garrity* protections do not apply to statements made during interviews where no employment discipline is at stake, because the purpose of *Garrity* is to protect law enforcement officers from having to make a choice "between self-incrimination or job forfeiture." *Garrity*, 385 U.S. at 496. Zambrano did not face that choice: he could have chosen not to speak, and the form specifically said that he would not have forfeited his job (or even have been disciplined in any way) as a result. The Seventh Circuit has specifically contemplated a scenario where *Garrity* protections could be waived because the officer is "told that he can take the Fifth without repercussions." *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 991 (7th Cir. 2002).

23

Zambrano argues that despite the waiver form, his statements were compelled because he was still "subject to the rules and regulations of Palos Heights Police Department," and under those rules, he was required to cooperate with law enforcement investigations or face possible discipline. Def's. Reply at 7. He submits an affidavit from Palos Heights Chief of Police George Yott in support of these assertions. R. 46-1, Exh. O, Yott Affidavit ¶¶ 7–8. But absent from that affidavit is any suggestion of whether Yott (or any other Palos Heights supervisor) knew about Zambrano's April 4, 2019 interview, whether they discussed the interview, and whether Yott would have respected the OIG waiver form that told Zambrano he did not have to answer questions.

Still, because Zambrano was formally a Palos Heights police officer, the issue remains on the table: would a reasonable officer in Zambrano's position have believed that the Palos Heights rules trumped the OIG waiver the federal agents provided to him? This is by far the closest question that Zambrano has presented, but considering all of the surrounding circumstances, it actually is not all that close of a question. The Court finds that a reasonable officer in Zambrano's position would *not* have held this belief. Zambrano had been detailed to the HSI federal task force for six years by the time he stepped into the conference room with Weller and Chesla. Although he was still a Palos Heights police officer, as a federal task force officer he worked in federal office space and used federally issued equipment. Gov't. Br. at 2. Moreover, the interview he attended on April 4 was about his duties as an HSI task force officer, not his work for the Palos Heights Police Department. Gov't. Br. at 17. Nobody from the Palos

24

Heights Police Department participated in the interview. *See generally*, Transcript and Audio. The interview was conducted by an FBI agent and an OIG agent. Zambrano has simply not presented any evidence that any state or local actors forced him to participate in this specific interview, or would have disciplined him for refusing.

The government also argues that *Garrity* does not apply because it protects only truthful statements, not false ones. Gov't. Resp. at 17. Indeed, the Seventh Circuit has held that law enforcement officers do not have "the right … to knowingly make a false material declaration while testifying under oath before a grand jury." *United States v. Devitt*, 499 F.2d 135, 142 (7th Cir. 1974). This is because *Garrity* protects officers from facing consequences for past crimes to which they admit during compelled testimony—but does *not* permit officers to commit the *separate* crime of lying during that testimony. *Id.* "In short, while a public employee may not be put to the Hobson's Choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, *i.e.*, lying." *Id.* (quoting *United States ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1971)). This reasoning would seem to apply just as well to false statements made as part of a federal investigation as it does to perjury, because both are crimes targeting lying (not past crimes). The D.C. Circuit has agreed that *Garrity* does not protect falsehoods. *See United States v. White*, 887 F.2d 267, 274 (D.C. Cir. 1989). And more recently, the Supreme Court has noted, though admittedly outside the *Garrity* context, that "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." *Brogan v. United States*, 522 U.S. 398, 404 (1998). So even if it were true that Zambrano should have received *Garrity*

25

warnings—which is not what this Court holds today—this would not have protected him from the consequences for lying to federal agents.

Zambrano's statements were not protected by *Garrity*. His motion to dismiss the indictment against him on *Garrity* grounds is denied.

### 3. Coercion

Next, Zambrano argues that his statements during his interview were coerced in violation of his Fourteenth Amendment due process rights, regardless of whether he was in custody. Mot. to Dismiss/Suppress at 17. This argument fails for essentially the same reasons that doomed his *Miranda* argument: the evidence does not show that the circumstances of his interview were such that they would have "overcome his free will" and rendered his confession involuntary. *Dillon*, 150 F.3d at 757.

There is no need to review (again) every aspect of Zambrano's interview with the agents, but it is worth noting a few additional facts that belie the notion that he was coerced. As a reminder, the Seventh Circuit has explained some of the facts to consider when evaluating a claim of coercion: "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights, … physical punishment. … and fatigue …." *Huerta*, 239 F.3d at 871. There are no allegations at all on several of these factors: physical punishment, age, education, or intelligence. Zambrano does claim fatigue, saying in his brief that he was "exhausted," Mot. to Dismiss/Suppress at 5, but he never said so during the interview. He did share with the agents that his new baby was not sleeping through the night, but he never said

26

that he was particularly tired that day, and never asked for a break. Transcript at 5–6, 152. Nor did he ever ask for a lunch break or coffee, and when he asked for water, it was provided to him. *Id.* at 136. He was also offered and given restroom breaks. *Id.* at 45, 136. There is simply no suggestion in the record that Zambrano was so fatigued that he could not give voluntary statements. For all the same reasons, the length of the interview also does not give cause for concern. The waiver that Zambrano signed told him that the interview was voluntary, and as already discussed, he was never in custody, so he did not need to be read the *Miranda* rights. Although the Government has conceded that the interview can be seen as an interrogation, the nature of the interrogation was calm, professional and at times even collegial, as has already been discussed.

Zambrano argues that the "coercive nature and misrepresentations made by the FBI and DHS-OIG agents clearly violated Zambrano's due process rights under the Fourteenth Amendment." Mot. to Dismiss/Suppress at 18. It is not exactly clear what Zambrano means by "misrepresentations," though he may be referring to his allegations that the agents were intentionally trying to elicit false testimony from Zambrano, *id.* at 20, or that they really considered Zambrano a suspect during this interview, not a witness as they told him. *Id.* at 16, 21. But there is no *evidence* in the record to support these assertions.

It is again worth noting that Zambrano has not submitted an affidavit or any other evidence that he felt coerced during his interview, leaving this Court to rely on

27

the evidence that is in the record. That evidence does not support a finding that Zambrano was coerced into making the statements at issue in this case.

### 4. Entrapment

Zambrano further attempts to argue, as part of his motion to suppress, that the government entrapped him, inducing him to commit a crime he would not otherwise have committed. Mot. to Dismiss/Suppress at 19 (citing *United States v. Mayfield*, 771 F.3d 417, 420 (7th Cir. 2014)). But entrapment is a fact-intensive defense for the jury to decide, not an argument to be raised on a motion to suppress. *Mayfield*, 771 F.3d at 439.

Whether or not Zambrano can raise the entrapment defense during the trial should be litigated before the trial, at least in the first instance. Indeed, the government has filed a motion in limine to require Zambrano to proffer evidence before trial in support of his entrapment defense. R. 63, Gov't. Mots. in Limine. Zambrano objects to the motion but has deferred his detailed response until after the instant motion is decided. R. 72, Def's. Resp. to Gov't. Mots in Limine. Zambrano must respond to the government's motion and file his own motion to present an entrapment defense by August 26, 2021. The government may reply by August 28, 2021.

### C. Request for a Hearing

Zambrano requested a hearing on his motion. Mot. to Dismiss/Suppress at 1. To warrant a hearing on a motion to suppress, a defendant must make "a prima facie showing of illegality" in how law enforcement obtained the evidence at issue. *United States v. Edgeworth*, 889 F.3d 350, 354 (7th Cir. 2018) (cleaned up). To make this

28

showing, the defendant "must present definite, specific, detailed, and nonconjectural facts demonstrating that there is a disputed issue of fact." *United States v. Clark*, 935 F.3d 558, 568 (7th Cir. 2019) (cleaned up). For all the reasons already discussed, Zambrano has not met this burden. The request for an evidentiary hearing is denied.

## IV. Conclusion

The motion to dismiss the indictment or to suppress statements is denied in full. Zambrano must respond to the government's motion in limine on entrapment (and in that response, justify why he should be permitted to present entrapment) by August 26, 2021. The government may reply by August 28, 2021.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 21, 2021