**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:20-CR-00049 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FERNANDO ZAMBRANO | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Former law enforcement officer Fernando Zambrano is charged with know-ingly making false statements to federal agents in violation of 18 U.S.C. § 1001(a)(2). R. 1, Indictment.[1] After the denial of a first motion to dismiss the indictment, R. 76, and less than two weeks before the trial's start, Zambrano has filed a second motion to dismiss. R. 92. This time, he accuses the government of serious prosecutorial mis-conduct before the grand jury. R. 92. For the reasons discussed in this opinion, the motion is denied.

## I. Background

This opinion assumes familiarity with the facts of this case as laid out in the Opinion on Zambrano's first motion to dismiss. R. 76 at 2–11; *United States v. Zam-brano*, 2021 WL 3709194, *1–5 (N.D. Ill. Aug. 21, 2021).

For purposes of this opinion, it is also important to note that FBI Agent Tony Chesla, one of the agents who conducted the investigation underlying this case and interviewed Zambrano on April 4, 2019, testified before the grand jury on January 22, 2020. R. 98, Exh. GJ, Grand Jury Transcript. The government showed several

---

[1]Citations to the record are noted as "R." followed by the docket entry.

exhibits to Chesla (and thus to the grand jury) during his testimony, including at least part of the transcript of a phone call between Fernando Zambrano and Source A that took place on February 21, 2019. *Id.* at 33.

## II. Analysis

### A. Governing Standards

#### 1. Dismissal for Prosecutorial Misconduct

It is a violation of a defendant's Fifth Amendment due process rights for the government to knowingly present false testimony to the grand jury. *United States v. Useni*, 516 F.3d 634, 656 (7th Cir. 2008). But errors in grand jury proceedings (much like in trials), including prosecutorial misconduct, justify dismissal of the indictment only if they actually prejudice the defendant. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254–55. "For an indictment to be dismissed on account of false testimony presented to the grand jury, the defendant must show prejudice amounting to either proof that the grand jury's decision to indict was substantially influenced, or that there is grave doubt that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *Id.* (cleaned up).

#### 2. Standard for Evidentiary Hearing

A defendant who requests an evidentiary hearing on a motion to dismiss an indictment based on prosecutorial misconduct is not automatically entitled to a hearing. "Persons charging irregularities in the course of grand jury proceedings must present a *concrete basis* supporting the inference of misconduct." *Matter of Special April 1977 Grand Jury*, 587 F.2d 889, 892 (7th Cir. 1978) (emphasis added).

2

Moreover, the misconduct must have been material to the decision of the grand jury—if evidence separate from the alleged misconduct is sufficient to support the indictment, then there is no right to a hearing. *United States v. Udziela*, 671 F.2d 995, 1001 (7th Cir. 1982); *see also United States v. Benjamin*, 852 F.2d 413, 423 (9th Cir. 1988), *judgment vacated on other grounds*, 490 U.S. 1043, (1989) ("An evidentiary hearing is required on a motion to dismiss an indictment if defendants raise a material issue of fact which, if resolved in accordance with defendants' contentions, would entitle them to relief"); *United States v. Holloway*, 778 F.2d 653, 658 (11th Cir. 1985) (same). This makes sense, because an evidentiary hearing would be fruitless if the defendant, having shown that the government presented false information to the grand jury, then could not show prejudice and thus could not obtain a dismissal.

## B. The Alleged Misconduct

Zambrano says that there are "numerous examples of false, misleading and improper information being given at the grand jury in this case." Def.'s Mot. at 6. His accusations boil down to allegations that Agent Chesla presented perjured testimony in six different instances. It makes sense to address each in turn, with each of the six alleged instances analyzed by first evaluating whether the statement was in fact false. Then, if the statement could plausibly be considered false, then the next question is whether the statement was material to the grand jury's decision and thus prejudiced Zambrano. Ultimately, none of Zambrano's accusations come close to

satisfying the requirements for dismissing an indictment, or even to hold an evidentiary hearing.[2]

### 1. Zambrano's Knowledge of the Investigation

Zambrano first takes issue with Chesla's testimony about Zambrano's knowledge of the investigation into his and Sabaini's activities, which Zambrano characterizes as follows: "Agent Che[sl]a told the grand jury that at the time Zambrano was interviewed and gave the alleged false statements, Zambrano was aware that internal affairs and the FBI were looking into the transaction involving $50,000.00 buy money." Mot. Dismiss at 6. Zambrano disputes both the actual existence of the investigation, and Zambrano's knowledge of it, arguing that Chesla's testimony was calculated to convince the grand jury that "Zambrano was covering his tracks and desperate to get out of the crosshairs of the Federal Government who were narrowing in on his crimes at the time of his interrogation." *Id.* at 7.

As an initial matter, Zambrano has exaggerated the gist of Chesla's testimony about *Zambrano's* knowledge of the investigation. As the government points out, Chesla testified only to his *belief* that Zambrano knew that the January 2017 transaction was under investigation. R. 98, Grand Jury Tr. at 25 (when answering whether

---

[2]Zambrano also makes much of the fact that he did not receive the full grand jury transcript until September 9, 2021, heavily implying that the government intentionally concealed the evidence from him. Def.'s Mot. at 1–2. This is another serious accusation. But by Zambrano's own admission, the government first produced the grand jury transcript on August 1, 2021, and he did not even *ask* for the missing pages until after business hours on September 9, 2021. *Id.* at 1; R. 92-1, Def.'s Exh. A, Emails. The government promptly produced the missing pages early on the next business day, citing "a technical issue," R. 92-1, Emails, without contradiction from Zambrano. No suspicious inference can be drawn from this sequence; instead, it was Zambrano who waited over five weeks to ask for the missing pages between August 1 and September 9.

Zambrano knew about the investigation, answering "Yes, I believe he did.") As Chesla explained on follow-up questioning, that belief was based on the fact that the investigating agents had asked for "a query on the report" of the January 2017 attempted drug deal, and that Zambrano and Sabaini had exchanged emails about this query. *Id.* These emails are trial exhibits (and were discussed at the pretrial conference), specifically Exhibits 204 and 205, and the Court has agreed that they may be presented to the jury (with conditions on foundation). R. 85 at 4–5. Although Zambrano may seek to rebut the inferences to be drawn about his knowledge of the investigation, he has not raised any serious question that Chesla had reasonable *grounds* for that belief. Put another way, Zambrano has not presented any concrete fact to suggest that Chesla was lying to the grand jury when he explained the basis for his belief.

Zambrano also challenges whether there actually was an investigation on April 4, 2019, but that challenge fails on both factual and legal grounds. There is no real factual dispute that the government was investigating missing funds before and on that date (though of course this finding is for purposes of this motion, and the jury (as always) gets to decide the case at trial). Chesla testified that the government was investigating missing funds to the grand jury, and Zambrano has presented no concrete factual basis to suggest that this was false. Grand Jury Tr. at 24. Chesla also testified that the unaccounted-for $50,000 from the January 2017 deal was important to the broader investigation into missing funds. *Id.* Zambrano points to two government memos dated after his interview as evidence that the investigation started *after* his interview, Def.'s Mot. at 7, citing Exhs. E and F, but all that means is that the

investigation *continued* after his interview (and he disregards the evidence that the investigation started earlier).

Confusingly, Zambrano also argues, in bold-face, that "the FBI and internal affairs did not 'look into' the transaction until much later. In fact, in September 2021, **more than 2 years after Zambrano's statement and almost a year after he was indicted**, the Government interviewed Eric Hyer, who is alleged to have been the supervisor who was 'looking into' the transaction." Def.'s Mot. at 7 (emphasis in original). The fact that the government interviewed Eric Hyer after the pre-trial conference—in which the need for his foundational testimony was discussed about the email notifications to Zambrano—is neither surprising nor suggestive of an *absence* of the prior investigation. No concrete factual basis calls into question the existence of the investigation as of the April 4, 2019 interview.

In any event, as a matter of law, a broader investigation into missing funds generally (even if not specific to the $50,000 buy money) would be enough to satisfy the 18 U.S.C. § 1001(a) requirement that the statements about the Source A conversations were material to (in the words of the statute) a "matter" within the government's "jurisdiction." R. 107 at 4–7 (order accompanying Court Set 1 of the revised jury instructions). In sum, then, as a factual matter, Zambrano has misstated Chesla's testimony: Chesla did not state that the government was specifically investigating the missing $50,000, only that the government was investigating missing funds in general, and that the $50,000 at issue in this case was relevant to that investigation. And, as a matter of law, it is unimportant that the investigation was on

this broader plane, because the government's investigation did not have to be specifically targeting that one drug deal (and its buy money) in order for false statements about the Source A conversations to be material to the investigation. The grand jury had more than sufficient evidence to return the indictment.

## 2. Report "Query"

Next, Zambrano accuses Chesla of lying when he said that the government's investigation included a "query" of the report of the January 2017 drug operation. Mot. to Dismiss at 7; Grand Jury Tr. at 25. Zambrano asserts that no query took place until months later, citing an FBI TECS query memo dated April 16, 2019. R. 92-4. Zambrano does not explain the importance of this exhibit, nor does he acknowledge Exhibits 204 and 205, that is, the email notification to Zambrano that the January 2017 transaction report had been viewed by Eric Hyer, and the email exchange between Zambrano and Sabaini about this viewing. In light of these exhibits, Zambrano's accusation that Chesla lied to the grand jury on this point is meritless. The statement was factually true based on the record.

## 3. Timing of Questions to Source A about the Buy Money

Next, Zambrano accuses Chesla of misleading the grand jury in response to a question about his interviews of Source A. Def.'s Mot. at 7–8. Specifically, the government asked Chesla about his first interview with Source A, which happened on February 19, 2019. Grand Jury Tr. at 27. The prosecutor asked if Chesla had asked Source A about the January 2017 deal during this call, and Chesla answered, "Through the number of interviews with Source A, yes, we asked him about that." *Id.*

This answer was general and vague, but the defense has presented no evidence that it was false, much less that it was a knowing misrepresentation that the prosecutor knowingly solicited.

Even accepting, for argument's sake, that the statement was false, it was immaterial to the charge in this case and the probable-cause finding, and thus did not prejudice Zambrano. Zambrano's statements to federal agents during the April 4 interview cannot be made more or less true based on when exactly Chesla asked Source A about the January 2017 deal. In this case, Zambrano is accused of having lied to federal agents about his conversations with Source A about the Source's interactions with the FBI. It does not matter, for purposes of finding probable cause to indict on the § 1001(a) charge, what the precise content of Source A's conversations were with Chesla; what mattered was that they took place, that Zambrano asked about them, and that Zambrano then (allegedly) lied to agents about having asked about them.

### 4. Purportedly Unrelated Case

Next, Zambrano asserts that Chesla "continued to mislead the grand jury when he attributed facts of a wholly unrelated case to the one at issue before the grand jury." Def.'s Mot. at 8 (citing Grand Jury Tr. at 28). Having reviewed the cited page of the grand jury transcript, the Court agrees with the governments' assessment that the testimony at issue did not address an unrelated case: "Instead, on that page, Agent Chesla accurately testified that Source A told agents that he remembered the January 9, 2017 deal as a consignment deal, that a young man gave Source A a bag of heroin during that deal, and that Source A did not remember receiving $50,000

that day." R. 101, Gov't. Resp. at 8. The January 9, 2017 deal is the one referenced in the indictment, R. 1, and is clearly relevant to the case at hand. Chesla's discussion of it was in no way improper or prejudicial.

### 5. Timing of Chesla's Review of Phone Records

The defense has clearly identified one actual mistake of fact by Chesla, but it is an immaterial one. The government asked Chesla about the April 4 interview with Zambrano, and specifically asked if, at the time Zambrano told him that he had not followed up with Source A about his contacts with the FBI, Chesla believed he was being untruthful. Grand Jury Tr. at 38. Zambrano answered that he did, based on having already reviewed Source A's phone records. *Id.* at 38–39. The defense contends—and the government concedes—that Chesla had *not* actually reviewed the phone records as of April 4, 2019. Def.'s Mot. at 9; Gov't. Resp. at 8–9. But Chesla *had* spoken to Source A before the interview, and had learned that way that Source A and Zambrano had spoken about Source A's contacts with the FBI. Gov't. Resp at 9. So, at the time of his interview with Zambrano, Chesla did have reason to believe that Zambrano was lying about not having talked to Source A. The defense has presented no concrete evidence that Chesla was knowingly and intentionally misleading the jury. Indeed, it is hard to imagine how this could be the case, because it would have had virtually the same impact if Chesla had presented the truthful, accurate history: that he believed Zambrano was lying based on his (Chesla's) conversations with Source A before April 4, and that Chesla later confirmed the suspicion when he later

reviewed the phone records. Chesla simply had no motive to lie about this minor detail.

But even if Chesla *had* knowingly lied to the grand jury about this point, it simply would not matter. There is no requirement that a § 1001(a) charge requires that law enforcement *immediately knew* that the defendant's statements were false. Indeed, this would make no sense. Often, the gravity of a false-statements offense is *more* serious when law enforcement agents initially *believe* the defendant's misrepresentations, and an investigation is derailed until the falsehood is uncovered.

Of course, the government needed to offer the grand jury probable cause to believe that Zambrano had lied about having spoken to Source A. But the government did not rely exclusively on Chesla's testimony about when and why he believed Zambrano was lying for this probable cause. Much more important was Exhibit A provided to the grand jury, that is, the transcript of the call between Zambrano and Source A on February 21, 2019. Chesla reviewed for the grand jury the sections in which Zambrano asked about Source A's contacts with the FBI. Grand Jury Tr. at 33–34. This was certainly enough to give the grand jury probable cause to indict.

### 6. Other "Shady Deals" / Investigations of Supervisors

Finally, the defense contends that Chesla (inaccurately) "told the grand jury that the investigations into Zambrano's shady deals were ongoing and included looking into the culpability of Zambrano's supervisors." Def.'s Mot. at 10 (citing Grand Jury Tr. at 48). As an initial matter, Chesla's testimony about interviews of supervisor came in response to questions from a *grand juror*, not from the prosecutor. So this

testimony cannot be used as a basis for an assertion of *prosecutorial* misconduct (unless—and there is no proof of this—the prosecutor knowingly let a lie go unaddressed). What's more, Zambrano's motion exaggerates what Chesla testified as to what supervisors did or did not do. Chesla simply testified—again, in response to a grand juror—"Yes, there was a lack of supervision, to say the least, and we're trying to determine through our investigation the exact level of the supervisor's involvement." Grand Jury Tr. at 48. So all Chesla said was that the government was trying to determine what, if any involvement a supervisor had in the missing funds.

As for the testimony about the broader investigation into the patterns of Zambrano and Source A's conduct, Zambrano has not presented any concrete facts or evidence to refute that testimony; he simply asserts in his brief that the *government* spun a false narrative about Zambrano's ongoing misconduct. Def.'s Mot. at 10. That is not a concrete basis to hold an evidentiary hearing, much less to dismiss the indictment. In any event, the testimony was not material to the grand jury's decision to indict Zambrano. There was plenty of other evidence, as already discussed, to support a finding of probable cause on the § 1001(a) charge.

Lastly, it is worth briefly noting and rejecting (again) Zambrano's argument that his "alleged false statements were pointless considering they did not impact any investigations whatsoever." Def.'s Mot. at 10. As the Seventh Circuit has repeatedly explained, it does not matter for purposes of Section 1001 whether the defendant's false statements actually influenced the federal investigation. R. 107 at 6 (citing cases).

### C. Evidentiary Hearing

As discussed for each category of allegedly false testimony, Zambrano has presented no concrete fact to suggest that the government knowingly solicited perjury before the grand jury, so he is not entitled to an evidentiary hearing. Even if any of Chesla's challenged statements could be considered perjurious, and knowingly solicited by the government, this (purely) hypothetical misconduct did not prejudice Zambrano, because other evidence supported the grand jury's finding of probable cause to indict.

In his reply brief, Zambrano objects to the government's reliance on *Matter of Special April 1977 Grand Jury*, 587 F.2d 889 (7th Cir. 1978), and then Zambrano argues that he has presented "concrete facts" warranting a hearing as required by that opinion. As an initial matter, even though that opinion dealt with an ongoing grand jury proceeding, the standard still sensibly applies here. The Seventh Circuit pointed out that challenging grand jury proceedings was disruptive and should not be allowed to happen without a substantial showing on the part of the defendant. *Matter of Special April 1977 Grand Jury*, 587 F.2d at 892. This Court will not take the equally drastic step of dismissing an indictment, or holding an evidentiary hearing into the grand jury proceeding, without a substantial showing by the defendant.

Indeed, even in a much less disruptive setting, courts require more than accusations before convening an evidentiary hearing. Specifically, when defendants challenge search-warrant affidavits as being premised on false information, courts still require threshold showings before holding an evidentiary hearing. In *Franks v.*

*Delaware*, the Supreme Court held that a defendant is entitled to a hearing if he or she "makes a *substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is *necessary* to the finding of probable cause." 438 U.S. at 155–56 (1978) (emphasis added). As interpreted by the Seventh Circuit, convening a *Franks* hearing requires actual evidence of knowing falsity:

> Allegations of negligent or innocent mistakes do not entitle a defendant to a hearing, nor do conclusory allegations of deliberately or recklessly false information. The defendant must identify specific portions of the warrant affidavit as intentional or reckless misrepresentations, and the claim of falsity should be substantiated by the sworn statements of witnesses.

*United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013). The standard for a *Franks* hearing is thus similar to the standard for obtaining an evidentiary hearing on a motion to dismiss an indictment. The defendant must first make a specific, concrete allegation of misconduct. Perhaps it is possible in some cases to make the showing without affidavits, but Zambrano neither submitted an affidavit nor offered concrete facts in support of his arguments. The prejudice element too is similar: the defendant must also show that, absent the misconduct, there would have been no probable cause—whether for the search warrant in the *Franks* context or for the indictment in this one. *Id.* This makes sense because, as already discussed earlier, an indictment will not be dismissed based on prosecutorial misconduct if it was supported by probable cause even without the improperly presented (or inaccurate) evidence.

13

Here again Zambrano has not made the requisite showing to obtain an evidentiary hearing.

### D. Request for Reconsideration

In his reply brief, Zambrano asks the Court to reconsider its earlier denial of the first dismissal motion in light of the "specific and nonconjectural facts of Chesla's misconduct" that Zambrano says he has presented in this second motion to dismiss. R. 104, Def.'s Reply at 4. But Zambrano's first motion to dismiss had nothing to do with prosecutorial misconduct or the grand jury. R. 44, Def.'s Mot. to Dismiss/Suppress. In any event, nothing that Zambrano has offered in this second motion provides any reason to reconsider the earlier denial of the first motion to dismiss.

### III. Conclusion

Zambrano's motion to dismiss the indictment is denied, and no evidentiary hearing is required.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 22, 2021

14