**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 1:20-CR-00049 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| FERNANDO ZAMBRANO | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

A jury found Fernando Zambrano guilty of the sole count against him: making materially false statements in a matter within the jurisdiction of the United States, in violation of 18 U.S.C. § 1001(a)(2). Specifically, the jury found that Zambrano, who was a police officer and served on a federal narcotics task force, lied to agents from the Federal Bureau of Investigation and the Department of Homeland Security Office of Inspector General about whether he had followed up with a confidential source about that source's contacts with the FBI. Zambrano moves for acquittal under Criminal Rule 29 and a new trial under Criminal Rule 33. R. 135, Mot. for Acquittal; R. 134, Mot. for New Trial.[1] For the reasons discussed in this Opinion, his motions are denied.

---

[1]Citations to the record are noted as "R." followed by the docket number.

1

## I. Rule 29—Motion for Acquittal

### A. Legal Standard

At the close of evidence in a federal criminal jury trial, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant can file or renew a motion for acquittal after a guilty verdict. Fed. R. Crim. P. 29(c). To prevail on a motion for acquittal, a defendant "must show that when viewing all the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the offense[] beyond a reasonable doubt." *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007). A jury verdict may be reversed "only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (cleaned up).[2] The Seventh Circuit has described this stringent standard as "a nearly insurmountable hurdle" to obtaining a judgment of acquittal. *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015) (cleaned up).

The Seventh Circuit has also held, under limited circumstances, that "where the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Harris*, 942 F.2d 1125, 1129–30 (7th Cir. 1991) (cleaned up). This principle "applies when the evidence is woefully inadequate to

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

establish an element of the offense." *United States v. Persfull*, 660 F.3d 286, 294 (7th Cir. 2011) (cleaned up). If there is evidence in the record, either direct or circumstantial, to support each element of a crime, then the principle does not apply. *Id.*

## B. Analysis

The charged crime in this case was broken down into five distinct elements for the jurors, who were instructed that they could reach a verdict of guilty only if the government proved beyond a reasonable doubt that:

1. The defendant made a statement;

2. The statement was false;

3. The statement was material;

4. The defendant acted knowingly and willfully; and

5. The defendant made the statement in a matter within the jurisdiction of the executive branch of the government of the United States.

R. 124, Final Jury Instructions at 22. As an initial matter, the defense does not challenge the sufficiency of the government's evidence to prove that Zambrano made a statement that was false and that was in a matter within the jurisdiction of the executive branch of the federal government. Indeed, the evidence at trial showed that, on three separate dates in February 2019, Zambrano spoke with Source A on the phone, asking him repeatedly if he had spoken with the FBI, telling him to update Zambrano on what the FBI said, and telling Source A that he did not have to speak to the FBI. Gov't. Exhs. 002–005 (phone recordings); Gov't. Exhs. 100–03 (translations of phone recordings). But on April 4, 2019, Zambrano told federal agents from

3

the FBI and DHS-OIG that after he told Source A to call the FBI, he "never heard anything more" about Source A's contacts with the FBI, repeating the gist of that statement several other ways. *See* Gov't. Exh. 7. The evidence thus clearly showed that Zambrano made a false statement to federal agents on a matter with the investigative agencies' jurisdiction.

Instead, Zambrano's argument focuses on the elements of materiality and, separately, whether he acted knowingly and willfully.

### 1. Materiality

The evidence at trial was more than sufficient for a rational jury to find, beyond a reasonable doubt, that Zambrano's false statements were material to a federal investigation. The government called to the stand the two federal agents who conducted the interview in which Zambrano's charged conduct took place. DHS-OIG Agent Louis "Tony" Chesla and FBI Agent Zachary Weller testified to the jury that their agencies were both investigating $50,000 in unaccounted-for drug-buy money at the time that they interviewed Zambrano. *See* R. 131, Tr. Vol. 2 at 355:1–356:20; R. 132, Tr. Vol. 3 at 599:3–600:15, 610:12–24. The government presented paper records from this investigation, including a transaction receipt from January 9, 2017, showing that Zambrano and his partner on the federal task force, Anthony Sabaini, had given $50,000 to Source A that day to buy heroin in a controlled buy. Gov't. Exh. 201, Confidential Transaction Receipt; Tr. Vol. 2 at 356:5–364:11. When investigators tried to trace the money from that transaction, they were able to confirm that Zambrano and another agent withdrew the money from the bank, but the investigation did not turn up any

4

records of how those funds were used or whether they were returned to the agency. *Id.* at 370:2–371:9, 375:11–376:25; Gov't. Exh. 200, Bank Withdrawal Record. Chesla further testified that he had interviewed Source A about (among other things) the unaccounted-for $50,000. Tr. Vol. 2 at 393:20–394:9.

Chesla and Weller both testified that it was important to their investigation to know the truth about whether Zambrano knew that Source A was being interviewed, whether the two of them had discussed the interview, and if so, what exactly they had discussed. Tr. Vol. 2 at 435:17–437:4; R. 132, Tr. Vol. 3 at 624:13–627:11. Specifically, Chesla testified that it was important to have this information because: "If two witnesses are talking about, whether it's getting their story straight or trying to make sure one person says or doesn't say something, that's going to be relevant to our investigation because it's going to indicate to us that there's some issues there or something that we need to look into." Tr. Vol. 2 at 436:24–437:4. Weller gave a similar answer and added that agents would want to know if Zambrano and Source A had discussed any other narcotics transactions that were unknown to Weller and Chesla but that the agents would have wanted to know about. Tr. Vol. 3 at 624:22–625:18. Weller also explained that knowing what exactly Zambrano and Source A discussed "would have been important from an investigative standpoint so we could be more prepared or better able to interview Mr. Zambrano on certain topics if we had knowledge about what he was speaking with [Source A] about." *Id.* at 626:23–627:1. The jurors thus heard ample evidence that could lead them to conclude that Zambrano's statements were material.

5

Zambrano argues that the government did not prove the materiality of the false statements beyond a reasonable doubt, but his arguments fail to confront the actual evidence presented at trial, let alone view it in the light most favorable to the verdict. Zambrano argues that the evidence at trial proved the *absence* of an investigation into the unaccounted-for $50,000, and thus the immateriality of his false statements. Def.'s Mot. for Acquittal at 6. But his citations to the trial record are incomplete and inapposite. He cites to the testimony of former Homeland Security Supervisory Agent Daniel Morro, and Homeland Security Agent Eric Hyer, who were unaware of the specifics of the investigation. R. 130, Tr. Vol. 1 at 249:12–14; Tr. Vol. 3 at 577:2–578:16. With good reason—neither was part of the investigative team. Tr. Vol. 2 at 342:2–6, 343:4–9. Zambrano also cites to Chesla's testimony that he did not ask Zambrano any questions specifically about the $50,000. Tr. Vol. 2 at 459:9–13, 465:2–21. But that is not the same as testifying that Zambrano's statements were irrelevant to the federal investigation. As already discussed, Chesla and Weller both testified to the contrary. Finally, Zambrano cites to Weller's testimony that Weller and Chesla were interviewing Zambrano as a witness, not a criminal suspect. Tr. Vol. 3 at 653:22–654:15. But witnesses can (unfortunately) make materially false statements in violation of 18 U.S.C. § 1001 just as criminal suspects can. And Zambrano completely ignores the record evidence discussed above, from which the jury could find that Zambrano's statements were material.[3] The jury verdict cannot be overturned based on lack of support for the materiality element.

---

[3]In his reply brief, Zambrano argues that the jury should have heard evidence about alleged government misconduct in the investigation, and that if the jury had heard such

## 2. Willfulness

The evidence at trial was also sufficient to support the jury's finding that Zambrano made the false statements with a knowing and willful state of mind. Zambrano was a federal task force officer and, before his interview, he signed a Federal Employee Warning Form telling him that the interview was "part of an investigation being conducted by the Office of the Inspector General into alleged misconduct and/or improper performance of official duties" and "[a]ny statement you furnish may be used as evidence in any future criminal proceeding or agency disciplinary proceeding, or both." Gov't. Exh. 207, Federal Employee Warning Form at 1. He was thus clearly advised of the stakes of the interview, and the importance of telling the truth to the federal agents in the room. The government also presented ample circumstantial evidence that allowed the jury to conclude that Zambrano knew about the ongoing investigation even before his interview, and nevertheless chose to lie. Zambrano's supervisor on the task force, Daniel Morro, testified that the investigation was "common knowledge" among the officers in Zambrano's group. Tr. Vol. 1 at 247:10–17. The government also introduced emails that could lead a jury to conclude that in late January 2019, Zambrano knew that a supervisor outside his chain of command was reviewing the key report of the January 2017 deal involving Source A, and found this troubling

---

evidence, they would not have found him guilty because the government could not have proven materiality or willfulness. R. 139, Def.'s Reply Acquittal at 1–3. But a Rule 29 motion is not concerned with evidence that the jury did not hear—it is concerned with the sufficiency of the evidence that *was* allowed. To the extent that Zambrano's arguments are relevant to his Rule 33 motion, they will be addressed later in this opinion.

enough to reexamine the report himself and communicate with his partner about it. Tr. Vol. 3 at 572:5–573:16; Gov't. Exhs. 204, 205.

Moreover, Zambrano did not equivocate or hedge when denying having spoken to Source A about the FBI—he said, repeatedly, that he had not followed up with him, even though this was not true. Gov't. Exh. 7. At other points during the interview, Zambrano said that he did not remember or could not recall certain things. *See, e.g.*, Gov't. Exh. 1 at 4:05:40, 4:07:20. But Zambrano did *not* say that he did not remember speaking to Source A about his contacts with the FBI; he outright said that he had not spoken to him. The full recording of the interview was entered into evidence on the defense's motion. R. 85, Order at 3; Tr. Vol. 3 at 535:9–14. The jurors were able to listen to the recording during their deliberations, and they could take the substance, context, and tone of Zambrano's statements as evidence of his willful intent.

In support of his contention that he did not willfully lie, Zambrano relies heavily on his own characterization of the facts and circumstances of the interview, rather than the evidence as presented at trial. He argues that he had no motivation to lie, Def.'s Mot. for Acquittal at 7, but the jury could readily find otherwise. It is highly suspicious that a federal task force officer would want to know the details of what other investigators—conducting a separate investigation, as part of an investigative team that Zambrano was *not* part of—are asking a confidential source. Admitting that he had conversations with the source naturally would prompt the investigators to ask Zambrano what they talked about. A truthful answer on that score—that

Zambrano had counseled Source A that the source need not answer the agents' questions—would lead to even more suspicion of Zambrano and Sabaini.

Zambrano also reiterates his argument that "Zambrano was sleep-deprived, believed [he was] speaking to colleagues about matters with no fear of jeopardy and was interviewed for more than 4 hours without the benefit of notice of the subject of the interrogation, nor was he provided any reports to review." Def.'s Mot. for Acquittal at 7.[4] But the jurors, again, had access to the interview recording, and could judge for

---

[4]In his reply brief, Zambrano hints that the Court prevented him from arguing at trial that his answers during the interview were affected by the interview's length, his own fatigue, the fact that he was not allowed to review reports, and "the repeated lies and trickery of the agents." Def.'s Reply Acquittal at 2. He claims that "Defendant was unable to meaningfully explore any of these issues during trial ...." *Id.* This is untrue. Through various pretrial orders, the Court precluded Zambrano from making certain *legal* arguments, but explicitly left the door open for factual arguments like the ones he now says he was "unable to meaningfully explore."

First, in denying Zambrano's motion to dismiss the indictment or suppress his interview statements, the Court did not issue a sweeping decree that he could not argue, at trial, that his fatigue and the other circumstances around the interview affected his statements. R. 76. The Court simply found that those factors did not rise to the level of *Miranda* or *Garrity* violations, or coercion, such that his statements should be suppressed. *Id.* at 15–28. Later, in an order denying Zambrano's motion to present an entrapment defense, the Court explained:

> [M]uch of Zambrano's argument on entrapment reads more like a defense that he did not 'knowingly and willfully' make false statements. He argues that the agents 'knew that it would be likely that Zambrano would be mistaken on one or more topics discussed in the lengthy interrogation and they could use the false statement charge as leverage.' Def.'s Resp. at 3. But Zambrano is not charged with making a mistake—he is charged with knowingly and willfully making a false statement material to the investigation. *If he wants to argue that he did not lie, but rather made an honest mistake, then of course he can present that argument to the jury*—but it is not the same thing as an entrapment spurred by government inducement.

R. 83 at 3 (emphasis added). The defense was thus specifically instructed that it could introduce evidence and argument about Zambrano's fatigue, potential confusion, and the length of the interview. And indeed, the defense did cross examine witnesses on these points. Tr. Vol. 2 at 457:19–459:13, 465:6–21, 470:18–471:9, 476:2–11, 489:11–25; Tr. Vol. 3 at 628:8–10, 635:2–636:14, 647:16–648:8.

themselves whether Zambrano sounded sleep-deprived or otherwise put-upon.[5] The government also introduced, as previously discussed, evidence that Zambrano was put on notice that his statements could be used against him in future. Nor does it matter, for purposes of willfulness, whether Zambrano was notified in advance of every possible subject of his interview. A jury could find, based on the evidence already discussed—which Zambrano ignores in his motion—that Zambrano's false statements were willfully and knowingly made.

For all these reasons, Zambrano's motion for judgment of acquittal must be denied.

## II. Rule 33—New Trial

### A. Legal Standard

The standard for granting a new trial is somewhat more lenient than the one for granting a motion for an outright acquittal. Federal Rule of Criminal Procedure

---

Later, the Court denied the government's pretrial motion to prevent the defense from cross-examining Chesla on his inconsistent statements in front of the grand jury, and his beliefs about the truthfulness of Zambrano's statements at the time of the interview. R. 118. The Court explained that although Zambrano was not permitted to make an argument grounded in prosecutorial misconduct—for all the reasons explained in the Court's Order denying Zambrano's second motion to dismiss, R. 110—he could question Chesla on topics relevant to potential bias. R. 118 at 2. And again, indeed, the defense did ask Chesla about his incorrect statements to the grand jury. Tr. Vol. 1 at 469:5–25.

[5]Zambrano's motion for a judgment of acquittal blatantly mischaracterizes the record on several points the Court has previously addressed. Zambrano emphasizes that "Zambrano did not consent to giving his cell phone," without acknowledging that the phone was government property, and that Zambrano did eventually talk to his attorney and hand over the phone. Def.'s Mot. for Acquittal at 4; R. 76, Mem. Op on Motion to Dismiss at 18. Most egregiously, the defense again says that Zambrano asked to put money in the parking meter and a federal agent refused to let him do so—when the interview transcript reveals *the exact opposite exchange*. Def.'s Mot for Acquittal at 5; R. 139 Def.'s Reply Acquittal at 4; R. 76 at 19.

33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." But the standard is still high: "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Morales*, 902 F.2d 604, 605–06 (7th Cir. 1990) (cleaned up). Motions for a new trial should be granted only in exceptional circumstances: "[I]f the judge believes there is a serious danger that a miscarriage of justice has occurred— that is, that an innocent person has been convicted—he has the power to set the verdict aside even if he does not think that he made any erroneous rulings at the trial." *Id. See also United States v. Hagler*, 700 F.3d 1091, 1101 (7thCir. 2012) (Rule 33 is "reserved for only the most extreme cases, and we approach such motions with great caution." (cleaned up)).

### B. Analysis

A few of Zambrano's arguments in support of his motion for a new trial are new and require extended discussion. The Court will first address those arguments, then more quickly review and dispose of several additional arguments that have already been addressed in previous opinions (or earlier in this one).

### 1. Motion in Limine on the $50,000 Buy Money

Zambrano filed a motion in limine to exclude any argument, evidence, or inference that the $50,000 in buy money was unaccounted for, or that Zambrano was in some way responsible for its being unaccounted for. R. 77. In his motion for a new trial, he announces: "At trial, Defendant's worst fear on this issue became a reality; the jury was tainted with the unmistakable belief that Defendant had stolen buy

money in this case." Def.'s Mot. for New Trial at 2. Zambrano again argues that there was no investigation into the missing buy money at relevant times, but the Court rejects this argument, as already discussed in Section I of this Opinion in addressing materiality.

What's more, the government followed through on its pre-trial promise not to argue or imply that Zambrano took the $50,000 or committed any other crime besides the one charged—a promise the Court had committed to enforcing, if necessary. R. 83 at 5. Zambrano points to no part of the trial transcript to show that the government somehow implied that Zambrano had stolen the money. On the contrary, the Government assiduously referred to the money only as "unaccounted for"—the jury heard the word "missing" associated with the money only when *defense counsel* used it during opening statements, witness examinations, and closing arguments. Tr. Vol. 1 at 212:17–19, 212:24; Tr. Vol. 2 at 274:5, 465:7–8, 465:18–20; 470:22–23, 471:7, 476:7; Tr. Vol. 3 at 549:2, 578:3–4, 578:14; R. 133, Tr. Vol. 4 at 776:23, 778:9, 783:20–21, 786:12, 787:3; *see also* Tr. Vol. 3 at 643:19–21 (Court noting at sidebar that it was only defense counsel who had repeatedly referred to "the missing $50,000").

Similarly, the word "suspect" first appears in the transcript when *defense counsel*, on cross examination, said to Chesla: "And you said at some point that Fernando became a suspect. Do you remember saying that?" Tr. Vol. 2 at 475:4–5. Chesla replied, "I believe he became a focus of the investigation," and defense counsel returned to the word "suspect," at which point the Court sustained the government's objection that counsel was misstating the witness's testimony. *Id.* at 475:6–10. When defense

counsel asked if Zambrano ever became a suspect, Chesla explained that Zambrano was eventually "listed as a *subject* in this investigation," not a suspect. *Id.* at 475:13–16 (emphasis added). Similarly, Agent Weller later testified that although he and Chesla "had a number of questions that we wanted to ask [Zambrano] regarding his involvement with handling confidential informants and investigations with Anthony Sabaini," the questions were for Zambrano as a witness, not a suspect. Tr. Vol. 3 at 654:2–15. So the government was not telling the jury that Zambrano was suspected of taking or hiding the $50,000.[6]

Zambrano says that the Court "compounded the error" on the buy-money issue by refusing to issue Zambrano's proposed special jury instruction: "There is no evidence in this case that the buy money remains unaccounted-for." Def.'s Mot. for New Trial at 2. The defense wanted to add this statement to the limiting instruction that

---

[6]In a bizarre twist, after the government carefully avoided presenting any more information than necessary about Sabaini to the jury, the *defense* brought up the fact that Sabaini faces criminal charges. During the cross-examination of FBI Agent Weller, defense counsel began a question, "Agent Sabaini is charged with a criminal offense," prompting the government to immediately object, and the Court to sustain the objection and instruct the jury to "disregard that question." Tr. Vol. 3 at 640:24–641:3. When defense counsel asked another question about the federal agents' investigation of Sabaini, the government objected again and, the Court convened a sidebar. *Id.* at 641:5–7. At the sidebar, defense counsel stated their position that "the government is trying to impute the criminal nature of Anthony Sabaini to Fernando Zambrano," and that the jury now needed to know that Sabaini faced charges unrelated to Zambrano or the investigation into the $50,000. *Id.* at 641:11–18. The government articulated its objection, which was based on relevance and the high risk of prejudice to Zambrano. *Id.* at 641:20–642:16. The Court agreed that the questioning was prejudicial and irrelevant, sustained the objection, and forbade defense counsel from pursuing the line of questioning. *Id.* at 642:17–643:4. The Court also reminded defense counsel that a jury instruction had already been crafted to help the jury avoid drawing unfair inferences from testimony about the unaccounted-for $50,000, and that it was only the defense counsel who had called it "the missing $50,000." *Id.* at 643:18–19. As the Court said at the end of that sidebar: "For all [the jury] knew, the investigation fizzled out and nothing ever came from it. So now, unfortunately, they have heard the opposite, but that's at your doorstep." *Id.* at 643:23–644:1.

the Court did issue, which was constructed to limit the prejudicial effect of evidence about the buy-money. R. 85 at 2–3. The defense now characterizes its proposed addition as conveying "undisputed truth," and claims that "the Court would not allow it because it may prejudice the Government." Def.'s Mot. for New Trial at 2. But, as a matter of law, it was not relevant to the jury's ultimate verdict whether the buy money remained unaccounted for—as the Court explained in its jury instruction. Final Jury Instructions at 20. And there was a risk of misleading the jury into thinking that there was no basis for an investigation in the first place (which in turn would give the jury the wrong impression on materiality). As discussed at the pre-trial conference and in the post-pre-trial conference Order: "Because this sentence would give the Court's stamp of approval to an inference that there was no unaccounted-for money in the first place, the Court rejected it." R. 85 at 2. In doing so, the Court was not favoring the government, but rather issuing a neutral, legally correct instruction that did not favor either side.

The government was permitted to introduce evidence about the unaccounted-for $50,000 as one basis for the investigation that included the agents' interview of Zambrano, and that is what it did. Final Jury Instructions at 20; Tr. Vol. 4 at 757:6–8. But the government's trial presentation focused more on the conversations that Zambrano had with Source A, and how they revealed the untruthfulness of his later statements to the federal agents. The presentation and contextualization of evidence about the $50,000 was not unduly prejudicial to Zambrano, and does not give the

Court cause for concern that the jury convicted an innocent person, such that a new trial would be warranted.[7]

## 2. Email Alerts (Exhibits 204 and 205)

Related to Zambrano's complaint about how the buy-money issue was handled at trial, he argues that the Court erred in allowing the government to introduce Exhibits 204 and 205 into evidence. Def.'s Mot. for New Trial at 4–5. Exhibit 204 was a "Record View Notification" email that was automatically generated and sent to Zambrano when supervisor Eric Hyer reviewed Zambrano's report of the January 9, 2017 heroin seizure. Hyer explained during his testimony why and how such emails are generated, and he confirmed that he was looking at the report around the time of the email alert, which is dated January 24, 2019. Tr. Vol. 3 at 572:5–73:19. Hyer also

---

[7]In his reply brief, Zambrano also argues, apparently for the first time, that evidence about the buy-money was prejudicial because of the substance of the indictment. He says that the government "improperly attached an incendiary unsupported allegation to Defendant at the indictment stage with the intent to poison the jury into believing Zambrano was a dirty cop." Def.'s Reply New Trial at 2. Although the argument is vague in the brief, it might refer to a similar argument defense counsel raised at trial, when he tried to cross-examine Weller on money being taken from a safe. Tr. Vol. 2 at 654:16–656:8. As the government pointed out then, there had been no testimony about a safe, only about Zambrano withdrawing money from a bank. *Id.* This is consistent with the indictment, which does not reference a safe. R. 1, Indictment ¶ 1(e). As the Court said at the sidebar, if there *was* something in the indictment that had not been proven at trial, defense counsel was welcome to discuss that in closing arguments. Tr. Vol. 2 at 656:14–18.

In any event, there are three additional problems with this argument. First, the defense was asked if it wanted anything redacted from the indictment before it went to the jury, and the Defendant did not ask for any supposedly poisonous statements in the indictment to be redacted. Tr. Vol. 3 at 729:7–730:5. Second, the jury was repeatedly instructed that the indictment is not evidence. Tr. Vol. 1 at 192:20–24; Tr. Vol. 3 at 742:18–743:2; R. 124, Final Jury Instructions at 3. Third, as discussed earlier in this opinion, the trial testimony simply did not take the "incendiary" turn Zambrano claims it did. In part because of the Court's rulings on motions in limine, evidence about the unaccounted-for $50,000 was permitted to enter the record for carefully limited purposes.

testified that Zambrano did not report to him and was not in his chain of command. *Id.* at 574:8–14. Hyer said that he was not responsible for reviewing Zambrano's reports and did not regularly review them. *Id.* Exhibit 205 was an email chain between Zambrano and Sabaini, in which both confirmed that they were looking at the report of the seizure; the two were reviewing the report on the same day (January 24) after Hyer looked at it.

The jury could easily have relied on those emails, Hyer's testimony, and additional evidence (including the conversations with Source A) to reach the conclusion that the government advanced, namely, that Zambrano was aware that the January 9, 2017 drug deal was under some scrutiny. Tr. Vol. 4 at 766:15–767:15. It is not correct, as Zambrano argues in his motion for a new trial, that "there was not a good faith basis for this assertion based upon these two exhibits." Def.'s Mot. for New Trial at 3. Both sides had the opportunity to present their interpretation of the evidence to the jury, and it was up to the jury to decide how to view the evidence. That the jury apparently found the government's presentation more convincing than the defense's is not grounds to grant a new trial.

### 3. Jury Instruction on Materiality

The defense believes that the Court erroneously modified the jury instruction defining "material" after the close of evidence in order to "make the Government's burden of proof simple." Def.'s Mot. for New Trial at 3. Before trial, the government had requested a version of the instruction including the words "a statement is material if it is aimed at misdirecting the FBI or DHS-OIG"—the Court rejected this

proposal on the basis that the instruction confusingly incorporated a mental state element into the definition of materiality, and was redundant with the Pattern Instruction. R. 107 at 4. During the jury instructions conference, the government renewed its earlier request for a similar instruction, on grounds that trial testimony had made it necessary. Tr. Vol. 3 at 718:16–719:16. The government requested that the jury be instructed that "a statement that misdirects the FBI or DHS-OIG or casts suspicion away from the defendant is material or can be material even if the statement did not actually misdirect the FBI or OIG or cast suspicion away from the defendant." *Id.* at 719:8–11. Based on developments during the trial, the Court granted the government's motion to elaborate on the definition of materiality, though not exactly in the way that the government proposed. In the end, the full jury instruction on materiality was:

> A statement is "material" if it is capable of influencing the actions of the Federal Bureau of Investigation (FBI) or the Department of Homeland Security – Office of Inspector General (DHS-OIG). The government is not required to prove that the statement actually influenced the actions of the FBI or DHS-OIG.

> A statement may be material even if the FBI or DHS-OIG agents believed that it was false at the time of the statement. A statement also may be material if the statement casts suspicion away from the speaker or misdirects the agents, even if the statement does not succeed in doing so.

R. 124, Final Jury Instructions at 24. The first paragraph comes directly from the pattern instruction. Seventh Circuit Pattern Criminal Jury Instructions at 375. The second paragraph is grounded in case law, *see United States v. Lupton,* 620 F.3d 790,

806–07 (7th Cir. 2010), and makes the point that materiality does not require that the agents be in the dark as to the truth or falsity of the statement.

The second paragraph (including its second sentence) took on greater importance after the defense cross-examined the agents' own beliefs about the statements' falsity. In evaluating the government's proposal, the Court noted that, during the trial, "there was quite vigorous cross-examination on the actual beliefs at the time of the interview of the FBI agent and the OIG agent." Tr. Vol. 3 at 721:5–7. The Court further noted that this could be confusing to the jury: "So the jury would be incorrect if they were to believe that just because the agents believed or knew that the statement was false, that that is not material, and that's—that is just inaccurate as a matter of law, so I think adding this sentence would disabuse them of that incorrect idea." *Id.* at 723:3–7. As the Court explained during the conference, the additional instruction did not change the government's burden of proof—it merely clarified the law for the jury. *Id.* at 723:17–724:1. This was not an error and cannot be grounds to grant Zambrano a new trial.[8]

### 4. Responses to Jury Questions

The defense takes issue with the Court's responses to two questions that the jury posed during their deliberations.

_____

[8]In his reply brief, Zambrano argues that his "alleged false statements were meaningless in anyway [sic] of significance." R. 140, Def.'s Reply New Trial at 2. The defense implies that if Zambrano's false statements did not affect the government's decision to charge Sabaini or Zambrano, or otherwise affect the investigation, they were insignificant—or in legal terms, immaterial. But that is not the law in the Seventh Circuit: "When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001." *Lupton*, 620 F.3d at 806–07.

### a. April 4 Interview Clips

The jury first asked, "Could the defense have introduced additional parts of the Apr. 4th interview if they believed it would have helped their client[?]" R. 126, Jury Questions at 14. As the Court noted while discussing this question with counsel for both sides, during the trial, the defense relied on the government attorneys to show the transcript of the April 4, 2019 interview to the jury. Tr. Vol. 4 at 811:21–25, 814:15–815:2. The defense did move Government Exhibit 1, the full recording of the interview, into evidence, over the governments' objection no less—but the importance of this motion in associating the defense with the exhibit may have been lost on the jury, especially because the exhibit was labeled "Government Exhibit 1" for logistical reasons. Tr. Vol. 3 at 535:9–14. Adding to the potential for confusion, when the defense reviewed portions of the interview with witnesses, they did so by asking the government to scroll, without audio, through the transcript of a short clip of the full interview—a demonstrative exhibit for Government Exhibit 7—which the prosecutors obligingly did. Tr. Vol. 2 at 457:6–15, 468:21–469:1; Tr. Vol. 3 at 630:25–631:9, 631:19–22, 631:24–632:4. To a judge or attorney, this was professional courtesy. But to a jury unfamiliar with the courtroom's evidence display system, and with the Rules of Evidence, it might have looked like only the government had access to the recording and transcript of the interview, or looked like the defense was not able to play other parts of that interview. This is particularly true because the defense in fact did *not* play for the jury any other parts of the exhibit beyond those highlighted by the Government in Exhibit 7—this despite the defense's insistence that the entire interview

recording should come into evidence.[9] As the Court said to defense counsel while considering how to answer the jurors' note, this created "a significant risk that the jury is thinking, 'Goodness, the defense could not even play the audio at trial.' So I think I need to eliminate that risk because that is—it's—obviously, it's fundamentally incorrect." Tr. Vol. 4 at 814:23–815:2.

To educate the jury on the realities of courtroom logistics, the Court proposed this response: "Dear Jury, the defense moved Government Exhibit 1, which is a recording of the entire April 4, 2019, interview, into evidence, and you have access to it in the evidence display system. Both sides had the opportunity to play part of the recording if they so chose." Tr. Vol. 4 at 812:1–6. Defense counsel objected to the second sentence on the grounds that they believed it implied that "If the defendant had something favorable, they would have played it for you in the case." *Id.* at 813:8–15. The Court replied then and reiterates now that its answer specifically *avoided* making that statement, sidestepping the specific question posed by the jury in favor of explaining that *both* sides had the ability to play the recording. To further avoid impermissible burden shifting, the Court offered (and the defense accepted) to add a

---

[9]During closing arguments, defense counsel said: "You heard me during the trial, I introduced into evidence the government's full tape, the full interrogation. They wanted little portions. We can take the whole thing." Tr. at 781:15–17. This might have helped the jury understand that the defense took some ownership of the entire recording. But counsel then went on to say he had considered introducing additional clips, and decided against it, concluding: "The entire interview is fine. You can—I'm not going to tell you how to do your job, but I'll tell you, put on any clip and you tell me if there is evidence beyond a reasonable doubt that Fernando Zambrano is intentionally lying. Pick any clip you want." *Id.* at 781:25–782:4. A reasonable juror listening to the closing argument could easily have been left wondering (indeed, the note later revealed that the jurors *were* left wondering) if it was difficult or even impossible for defense counsel to play clips of the interview, because the defense never did so.

sentence saying, "I remind you that the defense is not required to produce any evidence at all." *Id.* at 814:5–6.

In his motion for a new trial, Zambrano characterizes the jury's note as "asking if the Defense could have introduced evidence." Def.'s Mot. for New Trial at 4. He says the Court's answer "improperly shifted a burden to the defendant" and thus prejudiced Zambrano. *Id.* For the same reasons discussed on the record when the question first arose, the Court does not find that its answer to the jury's question shifted any burdens or prejudiced Zambrano. It was a neutral response calibrated to mitigate the significant risk that the jury had walked away from the trial thinking that the defense was given no opportunity to play parts of the interview that would have helped Zambrano. And the answer explicitly restated the legal principle, already articulated in the jury instructions, that the defense was not required to present any evidence.

### b. Special Questions to the Jury

Zambrano next takes issue with the Court's refusal to allow his attorneys to ask the jury which false statements were the basis of the verdict. Def.'s Mot. for New Trial at 4–5. This request arose out of the jury's final note to the Court, which asked: "Do we have to articulate which of the five statements we may be unanimous on?" R. 126 at 6. On the record with counsel, the Court opined that the answer was "no," because there was no special verdict form (and neither side had asked for a special verdict form). Tr. Vol. 4 at 824:6–7. Both the government and defense counsel agreed to the response. *Id.* at 824:8–11; 824:18–21. Around 20 minutes later, the jury reported that it had reached a verdict. *Id.* at 824:23–825:3. Upon hearing this, defense

counsel said, "I am going to poll the jury to make sure that there was a unanimous verdict on a specific false statement." *Id.* at 825:18–20. The Court did not grant defense counsel permission to do this. *Id.* at 825:21. As the Court noted, the jury instructions already told the jurors that they had to unanimously agree on the falsity of at least one of Zambrano's statements in order to find him guilty. *Id.* at 825:25–826:2. The Court also noted that if defense counsel had wanted to propose a special interrogatory, the defense should have done so earlier, when the Court was responding to the jury's last note. *Id.* at 826:2–5.

Now Zambrano argues that the jury's question "strongly implied that the jury had *not* reached a unanimous verdict on a particular statement." Def.'s Mot for New Trial at 4–5; Def.'s Reply New Trial at 3. He also says that he was denied the "right" to poll the jury. Def.'s Mot. for New Trial at 5. But defendants have a right to have the Court poll the jury as to the unanimity of the *verdict*, Fed. R. Crim. P. 31(d), not to pose verbal special interrogatories to the jury. Put another way, the defense does not have the right to quiz the jury on whether they understood and followed a particular jury instruction—and that is what defense counsel's request amounted to. The final jury instruction on false statements said that "the government is required to prove that the defendant made at least one of the false statements that is alleged in the indictment. To find that the government has proven this, you must agree *unanimously* on which particular false statement or false statements the defendant made, as well as all of the other elements of the crime charged." Final Jury Instructions at 29 (emphasis added). What's more, the government emphasized this legal principle

in its closing argument, telling the jury: "the government is required to prove that defendant made at least one of the false statements. And this part is important: to find the government has proven that defendant made a false statement, you must agree *unanimously* on which particular false statement identified in the indictment defendant made …." Tr. Vol. 4 at 759:3–9 (emphasis added). The jury was therefore clearly and repeatedly instructed about the requirement that they agree on the falsity of at least one of the five statements.

Given the clarity of the jury instructions, the jury's question about unanimity does not suggest that they misunderstood the unanimity requirement. It suggests, instead, that they wondered if they would be required to deliver a special verdict, that is, did they have to indicate which of the five statements was (or were) the basis of the verdict. In fact, as explained in the jury instruction, it was enough to convict the defendant if they decided unanimously that just *one* of his allegedly false statements was false. The most likely explanation for the note is that the jury had reached unanimity on the falsity of one or more of the statements, but still had not arrived at unanimity on others—or maybe had not even started discussing other statements. By asking whether they need to specify the statements that were the premise of the guilty verdict, they confirmed that they did not—and then they promptly reported their verdict. Unfortunately for Zambrano, the verdict was guilty. There was nothing prejudicial in the response to the jury's question, and it does not provide grounds to overturn the jury's verdict.

23

### 5. Miscellaneous Alleged Errors

The rest of Zambrano's motion for a new trial simply repeats arguments that the Court has already rejected, preserving them for appeal.[10] The defense argues the Court committed error in the following decisions.

**Denial of pre-trial motions to dismiss and suppress**. Zambrano moved to dismiss the indictment for failure to state an offense, or in the alternative, to suppress the statements he made during his interview with federal agents based on alleged violations of his *Miranda* and *Garrity* rights. R. 44. In his motion for a new trial, Zambrano contends that the Court improperly denied the motion, and rests on his previous briefs, making no new arguments. R. 134, Def.'s Mot. for New Trial at 2. The Court's reasoning in the opinion denying the motion still applies, and the Court finds no error in that denial. R. 76.

**Motions in limine.** The government filed a motion in limine to introduce recordings of conversations between Zambrano and Source A, which Zambrano opposed on hearsay and Confrontation Clause grounds. R. 63, Gov't. MIL at 9; R. 72, Def.'s MIL Resp. at 3–5. In his motion for a new trial, Zambrano rests on his previous briefs, making no new arguments. Def.'s Mot. for New Trial at 2. The Court's reasoning in the previous opinion still applies, and the Court finds no error in its denial of the motion. R. 80 at 4–8.

---

[10]In his reply brief, Zambrano asserts that the government has "waived argument on several of the issues discussed in this section. Def.'s Reply New Trial at 4–6. But really, because the defense made no new arguments on these matters in its opening post-trial briefs, the government responded in kind by resting on its earlier briefs. Gov't. Resp. New Trial at 3–4, 6–7. That is not a waiver or a forfeiture of any kind.

The government also filed a motion in limine to bar Zambrano from presenting an entrapment defense. Gov't. MIL at 12. Zambrano disagreed and asked to present the defense. Def.'s MIL Resp. at 3; R. 78, Def.'s Entrapment Resp. The Court granted the government's motion, finding as a matter of law that Zambrano had not proffered facts that would support entrapment even on the most permissive standard possible. R. 83. In his motion for a new trial, Zambrano rests on his previous briefs, making no new arguments. Def.'s Mot. for New Trial at 2. The Court's reasoning in the previous opinion still applies, and the Court finds no error in its denial of the motion.

**Denial of second motion to dismiss indictment.** Less than two weeks before the trial date, Zambrano filed a second motion to dismiss the indictment, this time based on alleged prosecutorial misconduct and violations of his due process rights. R. 92, Def.'s Second Mot. to Dismiss. In his motion for a new trial, Zambrano rests on his previous briefs, making no new arguments. Def.'s Mot. for New Trial at 3. The Court's reasoning in the previous opinion still applies, and the Court finds no error in its denial of the motion. R. 110.

**Denial of certain jury instructions.** Zambrano contends that the Court improperly refused to issue his preferred versions of various jury instructions. Def.'s Mot. for New Trial at 3. For the most part, Zambrano presents no arguments that the Court has not already addressed in its Order accompanying the Revised Jury Instructions before trial, and the Court finds no error in the jury instructions explained in that Order. R. 107. Zambrano does offer new arguments against the propriety of the materiality jury instruction, which the Court addressed earlier in this Opinion.

## 6. Additional Miscellaneous Arguments

**Insufficient evidence at trial to support conviction.** Zambrano argues that there was not enough evidence at trial to support his conviction. Def.'s Mot. for New Trial at 4. In support of this argument, he relies on and incorporates the arguments in his Motion for Judgment of Acquittal. *Id*. He makes no new arguments for the new-trial context, and in any event, the Court disagrees and finds that there was more than sufficient evidence presented at trial to support the conviction, for all the reasons already discussed.

**Manifest weight of the evidence**. Zambrano argues that the jury's verdict contradicted the manifest weight of the evidence and constituted a miscarriage of justice, again relying entirely on the arguments in his Motion for Judgment of Acquittal. Def.'s Mot. for New Trial at 4. This is arguably a forfeiture of the argument, because the "manifest weight" standard is different than the one that applies to a Rule 29 motion. But in any event, for the same reasons that the Rule 29 motion is denied, the Court finds that the jury's verdict did not go against the manifest weight of the evidence. There was plentiful evidence of the materiality of the false statement in casting suspicion away from Zambrano, and more than enough evidence that he made the statement knowing that it was false.

### III. Conclusion

For the reasons discussed in this Opinion, the Defendant's motions for a judgment of acquittal and for a new trial are denied.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: December 28, 2021